# DIANDRE T. MENTOR

# MITIGATION

# 6:24cr00091

A. Letters of Support
   a. Rose Moore (mother)
      i. UM Health Supporting Documents
   b. Maria Mentor (wife)
   c. Nadine Mentor Williams (Aunt)
   d. Claudia Mentor (Aunt)
   e. Gislene Moorman (Co- Founder of Space to Grow Charities)
   f. Gladys Beaubrun (Grandmother)
   g. Jacquelynn Jordan (Friend of family)
   h. Dr. Andre and Mrs. Jillian Baptiste (Community leaders)
   i. Marie Fleury-Stanis (Cousin of Mr. Mentor)
   j. Marjorie Stanley (Mr. Mentor's former teacher)
   k. Michelle Hamilton (Director of Young Life Global Ministries and TGI Empowerment Program)
   l. Natalie Graham (Mentee of Mr. Mentor)
   m. Queona Jones (Mentee of Mr. Mentor)
   n. Sam Metz (Supervisor)
   o. Sandra Pean (Mr. Mentor's former teacher)
   p. Attorney Steven Washington (friend)
   q. Walter Palmer (friend)
B. Mitigation Documents
   a. Certificates
   b. Resume
   c. Paystubs
C. Photographs
D. Articles



Rose Moore
20615 Jacaranda Road
Miami, FL 33189
(786)256-1575
MooreRose818@gmail.com

08/02/2025

The Honorable Wendy W. Berger

Character Reference for Diandre Mentor:

Dear Judge Wendy W. Berger,

I, Rose Moore, am the mother of Diandre Mentor, who is currently appearing before the court. I am respectfully writing this letter as a heartfelt plea seeking for your understanding and mercy during his sentencing. My son, Diandre is 34 years old, and despite this current situation, he is truly a good man with a genuine kind heart. He has the potential to make a meaningful and positive contribution to society which he has by volunteering at The Greatest Investment program for many years with the at-risk teenage youth.

My life as a mother to Diandre and his sibling was a difficult one because I was in an abusive relationship for many years with my children's father and my children were also affected by the abuse. With Diandre growing up having an abusive father in the household, it had a huge effect on Diandre. He did not have a real father figure to look up to in his life. At some point as a child, Diandre had to go and live with his grandmother (my mother) because of how difficult life was being raised in an abusive home. I have had the opportunity to see both Diandre's strengths and his struggles growing up, but because of the abuse, it has been very hard for Diandre. I know that he has made mistakes — mistakes that he deeply regrets and takes accountability for. However, these actions do not reflect the full character of the man that I've raised to be respectful and to have integrity. Diandre has always been helpful to others, respectful to his elders, strives to do the right things in life, and is deeply loving to his family. Anytime his grandmother should fall ill, he goes and is by her side to care for her. Also, he has been forming speaking support groups for young men to guide and prevent them from making similar mistakes.

Over the years, I have watched Diandre work hard on his job and on himself to be a better man. Although he has faced hardships and setbacks, he has also shown resilience and

desires much to grow. Even though he grew up in an abusive household, it was always his dream to go to college which he did. He has expressed to me the remorse he feels over this situation. Diandre has learned from this situation and has been focused on doing better.

If given the opportunity, my son will continue to use it to better himself and to be an advocate for others in the community. Diandre has not taken this situation lightly and has acknowledged his part in this situation. He has a very supportive and loving family who wants to see nothing but the best for him in life. As a single mother, I am ready and willing to help him through this situation. I recently lost my father in beginning of 2024 which had huge impact on me and my son's and it also caused a rapid decline in my health.  This lost impacted me mentally, physically and emotionally. I am pleading with you, your Honor on Diandre's sentencing as I am dealing with many serious health issues and only have Diandre in the house to care and watch over me as I manage through these life-threatening health issues. I was diagnosed with (ILD) also known as Interstitial Lung Disease, Pulmonary Fibrosis and Scleroderma in the lungs in which my organs, kidney and liver are affected. These diseases are not reversible, nor do I qualify for lung transplant. I am also battling high blood pressure. He takes me to my medical appointment as it is difficult for me to drive at times and understand what the medical doctors are sharing with me. Diandre makes sure to check on me daily, especially during the night as I am afraid to fall asleep, not knowing if I will wake up in the mornings. All of my health diagnosis and Diandre's situation have greatly affected me mentally, physically and emotionally. Diandre has consistently been my lifeline through these difficult times as I deal with all of my health issues and challenges in life overall. Therefore, I ask that you please have mercy on Diandre during this situation.

Thank you very much, Your Honor, for taking the time to read my letter and for allowing me to share and speak from the heart about my son's character. I respectfully ask that you show leniency and mercy to him and to allow him the opportunity of rehabilitation. Please allow him the chance to rebuild his life and make it purposeful.


Sincerely,


Rose Moore
Mother of Diandre Mentor



UNIVERSITY OF MIAMI HEALTH SYSTEM

Antonio R. Barquet, M.D.
Cardiology

August 11, 2025

RE: Rose Moore
DOB: 12/03/1971

To Whom It May Concern:

I am writing to confirm that Ms. Rose Moore is in my care for the management of her cardiac health.
Rose suffers from hypertension and mild valve disease; she also suffers from sleep apnea, scleroderma and interstitial lung disease followed by another specialists. I would like to mention that her son, Mr. Diandre Mentor is the sole care provider for his mother, Rose Moore.

Please feel free to contact me if additional information is needed, or if you require further details.

Thank you for your attention to this matter.

Sincerely,

Antonio R. Barquet, MD

351 N.W. Lejeune Road, Room Suite 105 | Miami, FL 33126
Phone: 305-689-3733 | Fax: 305-689-6430
abarquet@miami.edu



**UNIVERSITY OF MIAMI**
MILLER SCHOOL
of MEDICINE

August 06, 2025

Patient:    **Rose Moore**

Date of Birth: **12/03/1971**

To whom it may concern:

Rose Moore is under my care in pulmonary medicine. She has interstitial lung disease due to scleroderma and connective tissue disease. She requires ongoing monitoring and care for her condition. Her son Diandre Mentor is her sole caretaker.

Please do not hesitate to contact me with further questions or concerns.

Sincerely,

University of Miami, School of Medicine
Division of Pulmonary, Critical Care and Sleep Medicine



UNIVERSITY OF MIAMI
MILLER SCHOOL
of MEDICINE

**UHealth Diabetes Research Institute**
1450 NW 10TH AVE
1ST FLOOR CLINIC
MIAMI FL 33136
Phone: 305-243-7545
Fax: 305-243-8824

August 8, 2025

Patient:      **Rose Moore**
Date of Birth: **12/3/1971**
Date of Visit: **8/8/2025**

To Whom It May Concern:

Rose Moore is currently a patient seen in our rheumatology clinic for a diagnosis of interstitial pneumonia with autoimmune features. This condition affects the lungs (causing chronic interstitial lung disease) and also causes Raynaud's phenomenon. She reports her son, Diandre Mentor, is her sole care provider at this time. She continues to be symptomatic from the lung disease and given the chronic nature of her disease, she requires ongoing care.

If you have any questions or concerns, please don't hesitate to call.

Sincerely,

Kelly Kay Corbitt, DO
Division of Rheumatology
305-243-7545

    

The Honorable Judge Wendy W. Berger,

My name is Maria Pia Mentor, and I am writing this letter in support of my husband, Diandre
Mentor, who is currently facing legal proceedings. I write not only as his wife, but as someone
who has known his heart, his character, and his struggles in the most personal and intimate way.

Diandre and I have been married for 12 years. We have grown up together, supported one
another, and built a love that has endured hardship after hardship. Over the past several years,
our relationship has been tested by some of life's heaviest challenges: grief, illness, separation,
losses, and profound uncertainty. Ever since my mother was diagnosed with stage 4 metastatic
breast cancer, I have been in Italy caring for her full-time while she undergoes chemotherapy and
radiation treatments. I also care for my father, who suffers from mental health challenges. I was
also the primary caregiver for my grandmother, who battled dementia and Parkinson's disease
until her passing in December of 2024. I am not sharing this for pity, I am sharing it to give you
a full picture of our lives and why I have not been able to be by my husband's side as often as I
wished to be.

Despite the distance, Diandre is my anchor. He is the one person who brings me stability and
peace in the middle of everything falling apart. It has been incredibly painful not to have him by
my side during these times, especially when I needed him the most. Due to his legal situation, he
is not allowed nor able to travel to see me. Even though we are married, and I am living through
intense family illnesses and personal hardships, he has not been able to visit or support me in
person.

If he were to be taken away, we would not even be able to communicate because I am currently
living outside the country caring for my parents. He would not be able to call me, and I would
not even be able to hear his voice to comfort me. That is a pain I cannot begin to describe. The
emotional toll is immense, and I will be honest, I have had days when the weight of it all has
been so overwhelming that I have struggled to find the strength to keep going. I am not ashamed
to admit that I have had very dark thoughts at times. What keeps me holding on is the hope that

things will eventually get better, that good people will not always have to pay for the harm done by others.

During this incredibly stressful period, we also experienced the heartbreak of a miscarriage. We had been trying to grow our family for many years but were not successful until recently, yet for it to only end in a miscarriage. While the miscarriage occurred early in my pregnancy, the loss of our unborn child was devastating and deeply felt by both of us. We had so many hopes for the future, hopes that centered around starting a family together after all we have endured. It was one of the most painful moments in our lives, and unfortunately, we were forced to go through it apart. He could not be here to console me when I cried myself to sleep at night, and I could not be with him as he grieved. We are in our thirties, and the truth is, if my husband was to be taken away from me, our chance to have children could slip away forever since I have experienced challenges with getting pregnant. That thought weighs heavily on both of us every single day.

Diandre is not a criminal. He is truly a man of God: gentle, kind, loving, and sincere. Unfortunately, he was used, misled, and ultimately misguided. His only real mistake was placing trust in the wrong people and failing to fully inform himself, but he has never been malicious, and he is certainly far from a greedy person. He completely understands the role that he played in this situation, and he is remorseful for it, but has never taken more than he was given and he has paid for the consequences of others' actions more than anyone should. His family is also greatly suffering as Diandre is the glue that holds his family together. His mother is dealing with many serious health issues which include different lung diseases, high blood pressure and other serious diagnoses. Diandre is the person who takes care of his mother and her health matters every day. Therefore, the weight of this situation is being felt on both sides of the ocean.

For nearly two years, Diandre has worked consistently and has earned the respect of everyone at his job. He does not just show up, he brings humility, integrity, and a sincere desire to build an honest, stable life.

Your Honor, I respectfully ask that you see my husband not only as a name on a case file, but as the man I know. A good hearted, faithful, selfless person who brings light to those around him. I ask that your judgment be guided not only by the law, but also by truth, fairness, and compassion.

Your decision will shape not only his future, but mine as well. We have endured years of separation, personal losses, serious illnesses in our families, and more than our share of hardship and yet our love has remained strong. However, I am afraid that we may lose our only chance to grow our family and build the life we have fought so hard for. A life that includes starting a family together. That dream is slipping further away with each passing day. Your Honor, I ask you, please, from the depths of my heart, to give us a chance to hold on to it.

Thank you so very much for your time and attention.

With all my sincerity and hope,

Maria Pia Mentor

*The Greatest Investment Girls Empowerment Program*

(407) 803-2800 / nadine@tgicamp.org
www.tgicamp.org

July 28, 2025

Dear Honorable Judge Berger,

I pray that this letter finds you well. My name is Nadine Mentor Williams, and I am writing this letter in support of my nephew, Diandre Terrel Mentor. I am writing to share some insight into who he is beyond what he has regretfully done.

Diandre is extremely apologetic and truly remorseful for what he did and the people that were impacted by his actions. What he did was wrong. He knows he was wrong, and we make no excuses for his actions. More importantly, he is committed to being better and doing better. To this end, he has surrounded himself with a trusted group of community leaders, including myself, to keep him accountable and on an honorable path in service to others. We ae committed to help him mentally, emotionally and thoughtfully plan for his future.

Despite having a rough upbringing with a teenage mom and an abusive father, he was able to activate his mind and find refuge in his education. He was on honor rolls and received special recognition for his academic achievements. Despite being bounced back and forth between his mother's short-term rentals and his grandmother's house, sometimes sleeping in a car for days with his mom, he persevered. Growing up he was the role model for his brothers and younger cousins. He heavily invested in their upbringings.

Diandre is a good young man. He is kind, caring and compassionate. He knows suffering. He has lived in suffering. He wants to do better to care for his wife, his mom and his grandmother - the right way. I trust Diandre to do the right things going forward. Now that I have my own family and my own son, I know how important it is to have a positive male figure for him. My son has his dad, my husband, in his life – Diandre did not. This is a major factor in a young man's life, especially a young black man. Diandre has been an amazing role model for my son. My son ADORES Diandre. Diandre pours only goodness into my son's life. He guides him in the right direction and helps him to make good decisions to create a strong foundation for his future. My son needs Diandre, and son looks up to him. My son's face lights up when he sees Diandre.

Diandre's positive impact extends beyond our family. He has volunteered in homeless shelters, mentored young people and supports projects that empower women. He is truly a servant leader. He has volunteered for many years with The Greatest Investment Girls Empowerment Program. I am committed to supporting his journey to stay on the right path, and I know that his village will continue to rally around him. Diandre has amazing potential. Please give him the opportunity to do better now, and serve his community now.

I respectfully ask you to consider probation and community service so that Diandre can continue his positive impact on the next generation of young leaders. Please do not hesitate to contact me anytime at (407) 803-2800 /nadine@tgicamp.org anytime.

With Heartfelt Gratitude,

Nadine Mentor Williams
The Greatest Investment Girls Empowerment Program

August 1, 2025

The Honorable Wendy W. Berger

Re: Letter of Support for Diandre Mentor

Dear Honorable Judge Wendy W. Berger,

I am writing this letter with great respect and humility, on behalf of my nephew, Diandre
Mentor, who is currently facing charges before your court. I know the seriousness of the
situation and I am not here to make excuses, but I kindly ask you to consider his
background and the hardships he has endured when making your judgment. I respectfully
ask for your compassion and mercy as you determine an appropriate sentence in his case.

I have known Diandre since the day he was born, and I can say without hesitation that he is
truly a kind-hearted, caring individual with a deep sense of integrity. While he is now facing
the consequences due to the role he played, I believe it is important for the Court to also
consider the entirety of his character and life circumstances. Diandre had a very difficult
upbringing. He grew up in a home marked by instability and was in an abusive environment.
His mother, despite her best efforts, struggled with both financial and health challenges,
making it very difficult to provide the stable environment every child deserves. Eventually,
he had to go live with his grandmother, who did her best to care for him, but by that point,
he had already experienced significant emotional trauma. He struggled to cope and
ultimately battled with difficult hardships at a young age.

As his aunt, I recognize that he has made mistakes, but I also see the work that he had
done to turn his life around. He is not a hardened criminal. Diandre has never been a
malicious or dangerous person. He is a young man who has been shaped by
circumstances largely beyond his control, and who needs guidance, support, and the
opportunity for rehabilitation more than punishment.

His mother is currently battling multiple health issues, severe lung diseases, and this
situation has taken a heavy toll on her. Despite everything, she continues to love and

support her son who is her sole caretaker. His care and devotion to her well-being are unwavering, and he plays a crucial role in her daily life and overall health management. She depends heavily on her son to assist her with her daily healthcare needs. I am committed to doing my part in helping him get back and remain on the right path. If granted leniency, I will ensure he has the support system he needs to make better choices and become a productive member of society. Diandre is presently focused on doing his part as he speaks to boys and young men about his recent situation and on the importance of remaining on right path in life. He educates and mentors them on the importance of staying on a productive path in life and about preventing them from making the mistakes that he has made.

More recently, he and his wife suffered the devastating loss of their unborn child due to a miscarriage. This heartbreaking event has only compounded the emotional weight he already carries. Currently, his wife is in Italy, caring for her own critically ill mother and father. Despite this, he has remained resilient, showing genuine remorse for his actions and a sincere desire to make things right.

Your Honor, I am not asking for leniency simply out of familial loyalty. I am asking for a second chance for someone who truly wants to change and has been focused on doing better. I respectfully ask that you take his troubled background into account during sentencing. Your mercy could be the turning point in a young man's life who still has hope and potential for a better future. Diandre is not a danger to society and with the proper support, structure, and guidance, I know and believe he can and will rebuild his life.

Therefore, I respectfully ask that you consider allowing his sentence to be served under probation. Such an outcome would enable him to continue caring for his mother, focus on rebuilding his life which he has already started, and being able to emotionally heal/support his wife due to the loss of their unborn child. It would also offer him a real opportunity for rehabilitation, rather than pushing him further into despair.

Thank you for your time and for considering my plea. I also want to thank you for taking the time to read this letter. I have faith that your wisdom and compassion will lead to a decision that reflects both justice and humanity. May justice be tempered with compassion.

With deepest respect and much sincerity,

*Claudia Mentor*

Claudia Mentor

Aunt of Diandre Mentor



407-694-2246 | gigi@spacetogrow.org

July 30, 2025

To Whom It May Concern:

I am writing this reference letter in full support of Diandre Mentor, a dynamic young man with a history filled with caring service to the community and a future filled with promise.

*It is my honor to write this letter for Diandre for many reasons: his trustworthy character, his warm and engaging personality, his keen leadership qualities and his strong sense of responsibility for others. His dependability, service and resourcefulness have truly made our non-profit, Space to Grow Charities, a more effective service organization. Diandre is a smart, responsible, attentive, and caring young man who is passionate about serving and giving back to the Orlando community. I sincerely hope that through our testimonials, the court will see that Diandre is part of a strong village that will support him and help him to rebuild from this incident. I have no doubt that he is ashamed and remorseful about the mistake he made. I believe he has the strength and resilience to turn this situation around to help other young men avoid repeating his mistake.*

I was fortunate to first meet Diandre when he was a student at Valencia College in 2009. He was a full-time student, working a part-time job and still prioritized community service. It was this same year that he started to volunteer with Space to Grow Charities, a grassroots community initiative founded by three close friends and I in 2005 to support women and children in Central Florida's homeless shelters. Diandre has volunteered at Space to Grow Charities' Annual Baskets of Love Donation Drive and Valentine's Day Celebration for many years dating back to 2009. At the Annual Baskets of Love event, Diandre helped to collect and organize donation items, carried laundry supplies to residents' rooms in the homeless shelters and led arts and crafts activities with the children in the shelters. In February of this year, Diandre volunteered at our 20th Annual Baskets of Love Celebration. His unwavering dedication and consistent support have contributed so much to our organization and most importantly, he has uplifted the residents that we serve.

Diandre always showed genuine concern and respect when interacting with the coordinators, volunteers and shelter residents. It was truly powerful for the women and children in the shelters to see and interact with Diandre, a kind African American male who treated them with care and respect. Sadly, many of the women and children in the shelter were victims of domestic violence and didn't have positive experiences with black men. Diandre helped to change this negative profile for many of them. He showed them that they are worthy of love and respect by his caring mannerism and consistent compassionate presence.

Diandre has a unique ability to connect, relate, and inspire others. He listens, empathizes, and provides thoughtful guidance focused on addressing specific needs. I was able to witness this firsthand every time Diandre interacted with my son who is about seven years younger than Diandre. My son Jayson was about 11 years old when he first met Diandre. Diandre has always been a positive and caring source of inspiration for Jayson. Jayson admired the way that Diandre prioritized and loved his family, especially his grandmother. Like Diandre, Jayson was close to his grandmother and loved their special bond. Diandre always emphasized the importance of family, school, work and community when he talked to Jayson and other children in our community.

Diandre has generously donated his time and commitment to support Space to Grow's mission to uplift and celebrate women and children in Orlando's homeless shelters since 2009.

Please feel free to contact me directly at (407) 694-2246 or at iconnectrealtor@gmail.com with any questions.

Sincerely,

Gislene Moorman
Co-Founder, *Space to Grow Charities*

Scanned with CamScanner

August 4, 2025

The Honorable Wendy Berger

Re: Character Reference Letter for My Grandson, Diandre Mentor

Dear Judge Berger,

My name is Gladys Beaubrun, and I am blessed to be the grandmother of Diandre Mentor. I have known him since the very moment he came into this world and have loved him every single day of his life.

When Diandre was about five years old, his mother (my daughter) needed time to get her life in order. During that time, he and his younger brother came to live with me. From then on, I was not just Grandma, I was his caregiver, his guide, and his safe place. I raised him as my own, taught him all about the Catholic faith, and instilled in him the values of respect, honesty, kindness, and compassion.

Diandre and I have always shared a very special bond. A bond like no other. He has truly been one of my best friends and my rock for a very long time. We talk almost every single day, our conversations range from his hopes for the future, his current challenges, the loss of his unborn child, his faith, great family memories, to him checking on me when I am ill, to lighthearted moments that make us both laugh. He is always encouraging me to stay active, reminding me to eat well, take my daily medications, and pestering me in the most loving way to keep up with my routine exercises and staying healthy because, as he says, "We need you around for a long time, Grandma."

Whenever Diandre is with me, he is my helping hand, always there, anticipating what I need before I even have to ask. He drives me wherever I need to go, carries my groceries without me

ever asking, and helps with anything around the house. He does it all with pure joy, it is never out of obligation, but because he genuinely wants to help and care for me. It is some of these little moments where his love shines the brightest, when he takes my heavy bags before I can even reach for them, holds the door open for me and others with a smile, and makes sure I am comfortable before he even sits down. That same kindness does not stop with me. Whenever he is around others, he instinctively offers to help with their needs, provides warm words when needed, and is a steady arm to lean on. It is truly who he is at his core - thoughtful, attentive, and always putting others first. He is really an amazing man, and I am not just saying this because he is my grandson. I am sharing from the depths of my heart.

Your Honor, it has been incredibly hard for me to watch him go through these legal troubles. It has caused me deep pain, anxiety, and stress, to the point that it has affected my health. I had to be recently hospitalized for chest pain due to me worrying and in pain for him. I lie

awake some  nights thinking about him and praying deeply for him. I know in my heart, what is on your court  documents, is not the man I raised. Your Honor, I truly believe that with the right guidance and a  second chance, he will use this situation that he is currently facing as the moment which will  change his life for the better.

Diandre is far from a bad man. He is a good man who has made mistakes. I have seen his true  character which is a loving, respectful, and caring man. He is a man of integrity. I know those  qualities are still very much a part of who he is as I still witness them. Your Honor, I humbly ask  you consider showing him mercy, so that he can remain home, continue to focus on rebuilding  his life, and pursue being the amazing person, I have always believed and know him to be.

Thank you for listening to the voice of a grandmother who is pouring from her heart and who  knows her grandson's heart better than anyone else.


Respectfully,


Gladys Beaubrun

*Gladys Beaubrun*

Grandmother of Diandre Mentor

August 10, 2025

Dear Judge,

I am writing to express my support for Diandre Mentor, who is appearing before you today. I have known Diandre for over 15 years, and during that time, I have witnessed his dedication and positive relationship with his family, community, and with my 8 year old foster son, who adores Diandre. Over the years Diandre has taken time with him
and provided a great example through teaching him sports and spending time with him. I have observed him on many occasions with his grandmother, aunts, and other various elders in his family and community. He always go the extra mile to help his family. I believe that Diandre is remorseful, and capable of making positive contributions to society.

Very Respectfully,

Jacquelynn M. Jordan

From The Desk of Dr. Andre Baptiste and Mrs. Jillian Baptiste

August 7, 2025

To Whom It May Concern:

We are respectfully writing this letter in support of Diandre Mentor.  He is an exceptional young man who is truly apologetic for his errs and is committed to doing better in the future.  He is a beloved family man, mentor to youth and servant leader in the community.

We know Diandre through mutual friends and through volunteering together at various non-profit organizations, including Space to Grow Charities and The Greatest Investment Leadership Program.  Diandre is always kind, respectful and generous with his time to serve others.

We have interacted with him on many occasions and see how he treats his grandmother with love and respect, how he honors his family and how he engages with the youth – especially other young black men who he guides and inspires.

Diandre is truly committed to serving his community and be an example of learning from bad decisions and teaching others to do better.

We thank you for your consideration of the important points of Diandre's character as reflected in this letter.

Please do not hesitate to contact us - Jillian Baptiste at (407) 405-7596 or Dr. Andre Baptiste at (407) 963-0743.

Sincerely,

Jillian Baptiste

Dr. Andre Baptiste

August 1, 2025

Greetings,

My name is Marie Fleury-Stanis. This letter is in support of Diandre Mentor as he comes before you for his sentencing. I implore you to please consider the following and respectfully ask for you to give him probation as his punishment.

- He is deeply sorry for his actions and is committed to doing better in the future.
- He has mentored me and other young people to abide by the law and stay focused on doing the right things.
- He is a dedicated volunteer who has served over 100 hours to his community.
- He is a loving and caring husband, son, brother, grandson, uncle and cousin.
- He had a difficult and challenging childhood but persevered to do better in his future.
- He has a good job and has recently been recommended for a promotion.

With your support and compassion, Diandre will be a positive and contributing leader in our society. Please give him a chance to step up and help our community.

Blessings,

*Marie Fleury-Stanis*

Marie Fleury-Stanis

University of Central Florida Graduate

(407) 848-7646

August 5, 2025

The Honorable Wendy Berger

Re: Character Reference for Diandre Mentor

Your Honor,

My name is Marjorie Stanley, and I am a retired high school teacher with over 25 years of experience in the classroom. I am writing to offer a character reference for Diandre Mentor, whom I had the privilege of teaching at Coral Reef High School during my tenure there.

In my many years as an educator, I encountered a wide range of students, and Diandre stood out as someone with genuine integrity, humility, and compassion. He approached his education with a quiet determination and consistently demonstrated respect for both his peers and his teachers. Diandre was not only focused on his own success but frequently extended a helping hand to others, showing maturity and kindness beyond his years.

What I remember most about Diandre is the way he carried himself. He was dependable, thoughtful, and always willing to do the right thing, even when it wasn't the easiest path. Whether in the classroom, participating in extracurricular activities, or interacting with fellow students, Diandre consistently showed that he cared about others and took responsibility for his actions.

I understand that Diandre is now before the court, and while I am not fully aware of the

circumstances, I felt it important to speak to the character of the young man I came to know. I believe strongly in Diandre's potential to move forward in a positive direction. Based on my experience with him, I have no doubt that he is capable of learning from this situation and making meaningful contributions to his community.

Thank you for considering my perspective. Please do not hesitate to contact me if you require any further information.

Respectfully,

Marjorie Stanley

Retired High School Teacher

Coral Reef High School

*The Greatest Investment Girls Empowerment Program*

(904) 520-8349 * yl.mhamilton@gmail.com
www.tgicamp.org

Dear Your Honor,

My name is Michelle Hamilton.  I am the Area Director for Young Life Global Ministries.  I am also the Program Director for The Greatest Investment (TGI) Girls Empowerment Leadership Program.  In these two roles, I work with amazing young people all day, every day.  It is my purpose and my profession to pour into the next generation of leaders.

I write today to offer a fuller, deeply personal perspective on Diandre Mentor's character, and to underscore the profound, lasting impact he has had on our community. I respect the seriousness of the situation he faces and do not attempt to question or excuse the matter, but believe a broader understanding of who he is may be helpful.

From our very beginning in 2010, when TGI opened its doors to empower teen girls, Diandre stood by us—not just in spirit, but in action. He was part of our "inner circle" of family and friends, helping with seemingly simple yet foundational tasks: setting up tables where young girls would plan their futures, arranging chairs where they would listen to life-changing speakers, and managing our event technology so every voice could be heard. These contributions, while humble in look, created the physical and emotional spaces for young minds to explore, dream, and lead.

For many years, Diandre has also been a thoughtful, vulnerable presence on our Men's Panel - a safe, respectful forum where teen girls hear honest perspectives, including reflections on mistakes and redemption. His willingness to share personal learning instilled hope—that missteps do not define us, and that recommitting to better choices lays the groundwork for transformation. This important panel that we have every year allows our teen girls to hear and understand the male perspective on important topics that they are dealing with.  Diandre patiently answered the questions of the 25 to 50 young ladies who attend summer camp.   Diandre has also volunteered to set up and clean up many TGI events over the years, including our Annual End of Camp Celebration that is supported and attended by community leaders, parents, and volunteers.

In every effort with TGI, Diandre has shown extraordinary humility, reliability, and intentional kindness. He has been more than a volunteer—he has been part of our foundation. These years of dedicated service have created lasting, positive ripples in girls who are now gaining confidence and stepping into leadership.

Our community feels his absence keenly. We await the moment he can rejoin us—not merely as help, but as a loved mentor and example to the next generation. I remain committed to supporting his journey of renewal, and I know the girls whose lives he has touched would be inspired by his return.

Thank you, Your Honor, for considering this fuller portrait of Diandre Mentor. I respectfully ask the court to view his contributions and character in context, and appreciate the person behind the case.



*The Greatest Investment Girls Empowerment Program*

(904) 520-8349 * yl.mhamilton@gmail.com
www.tgicamp.org

As the Program Director of The Greatest Investment Girls Empowerment Program, it is with sincere respect and admiration that I write this letter of recommendation in full support of Diandre.

You may contact me at (904) 520-8349 /program@tgicamp.org anytime.

Kind Regards,

*Michelle M Hamilton*

Michelle Hamilton
Area Director, Young Life Global Ministries
Program Director, The Greatest Investment Girls Empowerment Program



August 11, 2025

To Whom It May Concern:

I am writing this letter in reference to Diandre Mentor. My name is Natalie Graham. I am a thankful mentee of Diandre Mentor. I met Diandre while a student at The Greatest Investment (TGI) Girls Empowerment Program about 15 years ago.

Diandre was warm, welcoming and helpful. He consistently exhibits a patient, positive, and professional demeanor, making me and others feel valued when life was difficult for my family and I. Diandre and his family helped me when I didn't have food or electricity. He and his family opened their home for me and my family.

Diandre has always encouraged me to stay in school. With his support, I successfully graduated from Florida International University (FIU). While a student at FIU, I didn't know many people in Miami, Diandre connected me with resources for college and helped me to secure a job. Diandre helped connect me with good people that cared about my growth and success.

Diandre continues to volunteer with TGI, the same organization that I used to attend and now proudly volunteer as well. Diandre is truly a dedicated pillar of his community as a volunteer and mentor to so many young people. His support is loyal, reliable and accountable. His presence of positivity and leadership is shown in his interactions with others. He is a volunteer that consistently goes above and beyond what is expected, often committing extra hours and willingly taking on additional responsibilities.

Diandre has helped me in so many challenging situations. He continues to encourage him and mentor me. He is a true blessing in my life and I am forever thankful for him.

Sincerely,

*Natalie Graham*

Natalie Graham
Volunteer, The Greatest Investment Foundation Inc.
(407) 808-9092

August 13, 2025


To Whom It May Concern:

My name is Queona Jones and I am writing this letter in support of Diandre Mentor.  He has
been a mentee and big brother to me for over 15 years through our participation in
empowerment and leadership programs.

Diandre has always guided me to do the right things and always advised me away from things
that can harm me today and can hurt my future.  Because of Diandre, I have been able to stay
out of trouble.  He has also been a role model for my younger brothers.   They look up to him
and he has always been patient and caring with them.  These are things that they didn't get
from their own father.

Diandre looked out for me even when I became a young mom at 23 years old.  He kept me
encouraged and focused on staying on track for my son.

Please consider all that he has done for me and others.  He is needed in the community.


Thank you,

*Queona Jones*

Queona Jones

To whom it may concern,

Diandre Mentor would make a great candidate for the lead agent program. In my time as his supervisor, I have witnessed him implement call handling feedback, increase his scorecard rank, show up to work with a positive attitude, and help his fellow team members excel in their role. These character traits and observations give me confidence that Diandre would make a valuable addition to our leadership team.

The lead agent program needs members who are willing and able to adapt to the constantly changing demands of our department. Diandre has proven that he can do this by implementing my feedback on his calls. More specifically, he has gone from learning the scripted process to skillfully handling customer's hesitations and strategically fighting for sales in a matter of months. This ability to implement coaching would help him to improve our agent's call handling abilities through coaching.

The RIS department needs leaders who are driven by sales metrics. Diandre has shown that he can influence KPI's (Key Performance Indicators). Diandre ended one of his first months on my team with 26% accepted conversion. He now ends most months with 30% accepted conversion or higher. The ability to influence his numbers is one that I look forward to seeing him pass on to other agents.

Our agents thrive in an environment where their leaders have a positive attitude, show up, and work hard. Diandre consistently shows up to work. Each day, he is ready to take on the challenges that his calls might bring. This is evident in his consistent performance. He does not let one call effect the next and so he is able to get the most out of each opportunity. Giving Diandre the opportunity to share this work ethic and attitude would greatly benefit our agents.

A solid candidate for the lead agent program is a person who is motivated to help others. Diandre does this in our huddles by answering questions and making suggestions on how to handle different call scenarios that we discuss. He also helps answer questions in our Teams chat and is always willing to allow his teammates to shadow him. I look forward to watching Diandre further develop his identity as a teacher by helping his fellow RIS agents through the LA program.

I think that Diandre Mentor should be admitted to the LA program because he is a quick learner, he is coachable, he understands how to influence sales metrics, he shows up with a positive attitude, and he is motivated to help the agents in our department. This is evident in the way that he has grown to be a valuable member of my team and this department. I hope you will consider Diandre for this opportunity to level up and further improve RIS. I would be happy to answer any questions regarding this endorsement.

Best,


Sam Metz

Sensitivity: Internal

August 11, 2025

To Whom It May Concern,

I am writing this letter on behalf of Diandre Mentor, whom I had the pleasure of teaching in my French class at Coral Reef High School. From the beginning, Diandre distinguished himself as an outstanding student and individual. He consistently demonstrated a strong work ethic, intellectual curiosity, and a level of maturity that set him apart from his peers. His thoughtful engagement in class discussions and his commitment to learning contributed meaningfully to the academic environment.

What made Diandre truly exceptional, however, went beyond his academic performance. He brought a calm and respectful presence to the classroom, fostering an atmosphere that was both welcoming and conducive to learning. He consistently offered support to fellow students, often taking the time to assist with assignments — always with kindness, patience, and humility. His natural ability to lead by example helped raise the standard for the entire class.

In addition to his academic strengths, Diandre displayed outstanding character. He was steadily responsible, respectful, and dependable. Someone I could always count on to meet expectations and uphold the values of our school community. His integrity, empathy, and great people skills will no doubt continue to serve him well in his endeavors. I have confidence in Diandre's ability to excel and to contribute positively to society. It was a privilege to be his French teacher.

Please feel free to contact me if you require any further information.

Sincerely,

*Sandra Pean*

Mrs. Sandra Pean

Former (Now Retired) French Teacher

Coral Reef High School

Steven L. Washington, Esq.

The Steven L. Washington Law Firm

(757) 582-1847

August 7, 2025

The Honorable Wendy Berger

United States District Judge

401 W Central Blvd

Orlando, FL 32801

RE: Character Reference for Mr. Diandre Mentor

Dear Judge Berger,

My name is Steven L. Washington, Esq., and I write this letter with deep respect and sincere intent in support of Mr. Diandre Mentor, as he approaches sentencing before Your Honor.

I had the privilege of meeting Diandre more than a decade ago while I was studying for the Florida Bar Exam and he was a sophomore in undergrad at St. Thomas University.

From the very beginning, Diandre stood out to me, not just for his intelligence, but for his warmth, generosity, and willingness to help others even when he had every reason to focus solely on himself. During that intense period in my life, Diandre became more than a friend, he was a steady anchor. While I prepared for one of the most grueling chapters of my legal career, he would sit with me into the early hours, patiently helping me organize outlines, test my knowledge, and stay grounded when the pressure became overwhelming. He never once made it about himself. Even when he had his own coursework and stress to manage, he showed up consistently for me.

His presence was calming, his words encouraging, and his willingness to invest in someone else's success without expecting anything in return is something I'll never forget. His belief in me became a driving force that helped carry me through. To this day, I honestly believe I wouldn't have made it without him. What impressed me then, and still does now, is his unwavering character. Diandre has always been someone who puts others first.

He leads with compassion, offers a helping hand without hesitation, and carries himself with quiet wisdom beyond his years. Even while dealing with his own personal challenges, he always found time to lift others up. That's who he is at his core. Since moving away from Miami to pursue my legal career, Diandre and I have remained close.

We've never lost contact, and whenever I return to Miami, whether for work or personal reasons, he's the first person I make sure to see. Our friendship has stood the test of time because it's rooted in genuine care and mutual respect.

I am fully aware that Diandre has made mistakes, and I know he holds himself accountable. But I hope this Court sees the man I've known for over a decade, someone who has changed lives, made a real difference in the people around him, and still holds the potential to contribute positively to the world.

Thank you for considering my words. I'm available should the Court require any additional information.

With sincere respect,

Steven L. Washington, Esq.

The Steven L. Washington Law Firm

(757) 582-1847

The Honorable Judge,

My name is Walter Palmer, and I am writing to speak on behalf of my dear friend, Diandre Mentor. I have known Diandre for over two decades, and I feel a deep responsibility to share with the Court the character of the man I have known since we were kids.

Diandre and I first met while volunteering in an afterschool program in our early teens. Even then, he stood out as someone with a kind heart and a strong sense of purpose. While most kids were focused on themselves, Diandre was already showing signs of the man he would grow to be. He was someone who gave his time and energy to others without expecting anything in return.

What brought us even closer was our shared love for video games. We spent countless hours indoors strategizing and playing together, while many of our peers were drawn to the streets and more dangerous distractions. Looking back, I truly believe that simple passion kept us grounded and safe. We always chose the path of quiet fun and brotherhood instead of anything that could lead us in the wrong direction.

Even more importantly, Diandre was always the calm voice of reason, especially for me. There were many times when I found myself angry, frustrated, or tempted to get involved with the wrong people or situations. Diandre was always the one who talked me down, helped me cool off, and reminded me to stay focused on doing the right thing. He never judged me. He just reminded me of who I am and what I am capable of. I can honestly say he kept me out of trouble more times than I can count.

As we got older, our bond only grew stronger. When I got married, there was no question who my best man would be. Diandre had always been by my side, not just as a friend, but as someone I genuinely admire. He shows up when it matters, supports the people he loves, and leads with quiet strength.

Your Honor, I understand the seriousness of this moment. I also know the Diandre Mentor I have grown up with and leaned on for over twenty years. He has always been someone who uplifts those around him, makes people better just by being present, and has the heart and humility to make things right when given the chance.

I ask that you consider the full scope of his character, the positive impact he has made in the lives of people like me, and the sincere potential he has to move forward in a meaningful way. Thank you for your time and consideration.

Sincerely,

Walter Palmer





**Space to Grow** Volunteer Appreciation

Awarded to

**Diandre Mentor**

Thank you for supporting Baskets of Love to empower homeless women and children.

*Gistine Moorman,* Space to Grow Co-Founder

February 8, 2025

# CERTIFICATE *of* APPRECIATION

## Diandre Mentor

is presented this Certificate of Appreciation for his dedicated support of The Greatest Investment Girls Empowerment Program for his many years of volunteer services.

*The Greatest Investment Girls Empowerment Program*

PRESENTED BY:

*Michelle Hamilton*
Camp Director

AWARDED ON:

August 2, 2019

Greatest Investment
Empowerment Summer Camp



St. Thomas University

The Archdiocesan University of Florida, United States of America

# 60 Seconds to Start Up 2016

### 2nd Place Winner

is presented to

## Diandre Mentor

on November 16, 2016.

Dean Somnath Bhattacharya
Gus Machado
School of Business

ST.THOMAS
UNIVERSITY
Gus Machado School of Business

Dr. Justin Peart
Director of the Institute for
Global Entrepreneurship

# Diandre Mentor

20615 Jacaranda Road • Miami, FL 33189
Phone: (786) 597-2301 • Email: diandre8373@yahoo.com

## Professional Summary

Entrepreneur and operations leader with over 15 years of diverse experience across customer service, finance, business development, and leadership. Proven track record of launching and growing businesses, supporting clients with tax and financial services, and navigating challenging environments with resilience. Known for reliability, leadership, and a deep commitment to personal and professional growth.

## Core Skills

Business Development & Startup Management • Customer Service & Client Relations • Financial Operations • Leadership & Team Building • Remote Work & Communication Tools • Sales, Marketing & Community Engagement • Microsoft Office & CRM Software

## Professional Experience

**Customer Service Agent (Remote) | Windstream Communications – Miami, FL (Remote) | Jan 2024 – Present**

Deliver high-volume remote support for internet and phone customers. Resolve service and billing issues with professionalism and accuracy.

**Founder & CEO | Game Payy – Miami, FL | Feb 2022 – Present**

Built and operate a tech-focused social gaming platform. Lead strategic planning, marketing, and operational growth.

**Founder & CEO | Smart Pac – Miami, FL | Nov 2016 – Mar 2019**

Oversaw logistics, branding, and client communication. Managed daily business operations and a small team.

**Founder & CEO | AcedIt – Miami, FL | 2015 – 2017**

Created and ran an academic editing and support business. Directed marketing, customer service, and operations.

**Sales & Booking Agent | Travel Now Vacation Packages – Miami, FL | May 2015 – Dec 2019**

Sold travel packages via outbound and inbound calls. Managed client reservations, upgrades, and follow-up care.

**Security Officer | G-Force / Reel Security – Miami, FL | May 2014 – Apr 2015**

Secured commercial premises and enforced protocols.

**Sales & Customer Service | Alorica (AT&T; / DIRECTV) – Miami, FL | Oct 2012 – Mar 2014**

Sold telecom services and provided customer solutions.

**Selling Associate | Macy's – Dadeland Mall, Miami, FL | Jun 2011 – Sept 2012**

Met sales goals and delivered customer support in a retail setting.

**Cashier | Publix Super Markets – Miami, FL | Aug 2009 – Oct 2011**

Provided checkout and in-store customer assistance.

**Cashier | Walgreens – Miami, FL | Jun 2008 – Aug 2009**

Handled transactions and assisted customers.

**Secretary (Work-Study Program) | St. Thomas University – Miami, FL | Aug 2010 – May 2012**

Handled clerical tasks and student inquiries.

## Community Service

The Greatest Investment Girls Empowerment Program – Mentored young girls on entrepreneurship, personal growth, and leadership.

Space to Grow Charities / Basket of Love – Organized and distributed care baskets to underprivileged families.

Boys Group, Miami – Guided young boys through skill-building workshops and community activities.

## Education

Florida International University – Miami, FL
Business Management Coursework, 2013 – 2016

St. Thomas University – Miami, FL
Business Management, 2012

Coral Reef Senior High School – Miami, FL
High School Diploma, 2009

## Professional Affiliations

FBLA – Future Business Leaders of America

CSA – Customer Service Association

Outreach Love – Community Mentorship & Support



| Employee Name: | Diandre T Mentor | Pay Date: | 5/23/2025 |
| Employee #: | 0193630 | Pay Period: | 5/4/2025 - |
| Employee Address: | 20615 Jacaranda Rd | | 5/17/2025 |
| | Miami, FL 33189 | Deposit Advice #: | 950534093 |
| Department: | KI Kinetic Ops | Pay Frequency: | Bi-Weekly |
| Job Title: | Res Inside Sales Consultant | Pay Rate: | 15.5250 |
| | | Federal Filing Status: | Single |
| | | Federal 2c/Extra Withholding: | No/$0.00 |
| | | State Filing Status: | (FL) |
| | | State Exemptions: | (FL) |

**Employer Name:** Windstream Services, LLC
**Employer Phone:** 855-411-6947
**Employer Address:** 4005 N Rodney Parham Road Little Rock, AR 72212

| | Current 5/4/2025 – 5/17/2025 | | | YTD As of 5/17/2025 | |
|---|---|---|---|---|---|
| | Hours/Units | Rate | Amount | Hours/Units | Amount |
| **Earnings** | **80.0000** | | **$1,350.68** | **913.2500** | **$17,627.78** |
| Regular Wages | 80.0000 | 15.5250 | $1,242.00 | 724.0000 | $10,944.00 |
| Overtime | | | | 18.5000 | $418.54 |
| Vacation | | | | 40.0000 | $600.00 |
| Holiday | | | | 34.0000 | $510.00 |
| Holiday Worked | | | | 20.0000 | $450.00 |
| Optional Holiday | | | | 20.0000 | $300.00 |
| Sick | | | | 40.0000 | $600.00 |
| Differential | 70.0000 | 1.5525 | $108.68 | 752.4967 | $1,136.66 |
| Commission | | | | | $2,632.11 |
| FLSA | | | | 16.7500 | $36.47 |
| **Taxes** | | | **$187.00** | | **$2,864.64** |
| Fed W/H | | | $83.68 | | $1,516.12 |
| FICA EE | | | $83.74 | | $1,092.92 |
| Fed MWT EE | | | $19.58 | | $255.60 |
| **Post-Tax Deductions** | | | **$9.47** | | **$104.17** |
| Supplemental Accident Plan | | | $3.81 | | $41.91 |
| Supplemental Critical Illness | | | $5.66 | | $62.26 |
| | Routing # | Account # | Amount | | Amount |
| **Net Pay** | | | **$1,154.21** | | **$14,658.97** |
| Direct Deposit | 063107513 | XXXXXX0732 | $1,154.21 | | |

| Accruals & Balances | |
|---|---|
| Optional Holiday Balance: | 40.00 Hours |
| Milestone Opt Holiday Balance: | 8.00 Hours |
| Vacation Bank Balance: | 0.00 Hours |
| Vacation-Carry Over Balance: | 0.00 Hours |
| Vacation Balance: | 80.00 Hours |

dayforce



| Employee Name: | Diandre T Mentor | Pay Date: | 6/20/2025 |
|---|---|---|---|
| Employee #: | 0193630 | Pay Period: | 6/1/2025 - 6/14/2025 |
| Employee Address: | 20615 Jacaranda Rd Miami, FL 33189 | Deposit Advice #: | 963700417 |
| Department: | Kinetic | Pay Frequency: | Bi-Weekly |
| Job Title: | Res Inside Sales Consultant | Pay Rate: | 15.5250 |

**Employer Name:** Windstream Services, LLC
**Employer Phone:** 855-411-6947
**Employer Address:** 4005 N Rodney Parham Road Little Rock, AR 72212

**Federal Filing Status:** Single
**Federal 2c/Extra Withholding:** No/$0.00
**State Filing Status:** (FL)
**State Exemptions:** (FL)

| | Current 6/1/2025 - 6/14/2025 | | | YTD As of 6/14/2025 | |
|---|---|---|---|---|---|
| **Earnings** | Hours/Units | Rate | Amount | Hours/Units | Amount |
| Regular Wages | 80.0000 | | $1,242.00 | 1,065.5000 | $20,782.16 |
| Overtime | | | | 794.0000 | $12,030.75 |
| Vacation | 80.0000 | 15.5250 | $1,242.00 | 19.0000 | $430.57 |
| Holiday | | | | 120.0000 | $1,842.00 |
| Holiday Worked | | | | 34.0000 | $510.00 |
| Optional Holiday | | | | 20.0000 | $450.00 |
| Sick | | | | 20.0000 | $300.00 |
| Differential | | | | 40.0000 | $600.00 |
| Commission | | | | 822.4935 | $1,245.33 |
| FLSA | | | | 18.5000 | $3,333.65 |
| | | | | | $39.86 |
| **Taxes** | | | $165.65 | | $3,397.42 |
| Fed W/H | | | $70.64 | | $1,807.59 |
| FICA EE | | | $77.00 | | $1,288.49 |
| Fed MWT EE | | | $18.01 | | $301.34 |
| **Post-Tax Deductions** | | | $9.47 | | $123.11 |
| Supplemental Accident Plan | | | $3.81 | | $49.53 |
| Supplemental Critical Illness | | | $5.66 | | $73.58 |
| | Routing # | Account # | Amount | | Amount |
| **Net Pay** | | | $1,066.88 | | $17,261.63 |
| Direct Deposit | 063107513 | XXXXXX0732 | $1,066.88 | | |

| **Accruals & Balances** | | | |
|---|---|---|---|
| Optional Holiday Balance: | 40.00 Hours | | |
| Milestone Opt Holiday Balance: | 8.00 Hours | | |
| Vacation Bank Balance: | 0.00 Hours | | |
| Vacation-Carry Over Balance: | 0.00 Hours | | |
| Vacation Balance: | 0.00 Hours | Vacation Taken: | 80.00 Hours |

dayforce



| Employee Name: | Diandre T Mentor | Pay Date: | 7/3/2025 |
|---|---|---|---|
| Employee #: | 0193630 | Pay Period: | 6/15/2025 - |
| Employee Address: | 20615 Jacaranda Rd | | 6/28/2025 |
| | Miami, FL 33189 | Deposit Advice #: | 970867645 |
| Department: | Kinetic | Pay Frequency: | Bi-Weekly |
| Job Title: | Res Inside Sales Consultant | Pay Rate: | 15.5250 |
| | | Federal Filing Status: | Single |
| | | Federal 2c/Extra | No/$0.00 |
| | | Withholding: | |
| | | State Filing Status: | (FL) |
| | | State Exemptions: | (FL) |

**Employer Name:** Windstream Services, LLC
**Employer Phone:** 855-411-6947
**Employer Address:** 4005 N Rodney Parham Road Little Rock, AR 72212

| | Current 6/15/2025 – 6/28/2025 | | | YTD As of 6/28/2025 | |
|---|---|---|---|---|---|
| | Hours/Units | Rate | Amount | Hours/Units | Amount |
| **Earnings** | **80.5000** | | **$1,332.43** | **1,146.5000** | **$22,686.59** |
| Regular Wages | 50.0000 | 15.5250 | $776.25 | 844.0000 | $12,807.00 |
| Overtime | 0.5000 | 24.0638 | $12.03 | 19.5000 | $442.60 |
| Vacation | | | | 120.0000 | $1,842.00 |
| Holiday | | | | 34.0000 | $510.00 |
| Holiday Worked | | | | 20.0000 | $450.00 |
| Optional Holiday | 30.0000 | 15.5250 | $465.75 | 50.0000 | $765.75 |
| Sick | | | | 40.0000 | $600.00 |
| Differential | 50.5000 | 1.5525 | $78.40 | 872.9935 | $1,323.73 |
| Commission | | | | | $3,904.70 |
| FLSA | | | | 19.0000 | $40.81 |
| **Taxes** | | | **$183.42** | | **$3,750.24** |
| Fed W/H | | | $81.49 | | $2,014.71 |
| FICA EE | | | $82.61 | | $1,406.57 |
| Fed MWT EE | | | $19.32 | | $328.96 |
| **Post-Tax Deductions** | | | **$9.47** | | **$132.58** |
| Supplemental Accident Plan | | | $3.81 | | $53.34 |
| Supplemental Critical Illness | | | $5.66 | | $79.24 |
| **Net Pay** | Routing # | Account # | Amount | | Amount |
| Direct Deposit | 063107513 | XXXXXX0732 | **$1,139.54** $1,139.54 | | **$18,803.77** |

| **Accruals & Balances** | | | |
|---|---|---|---|
| Optional Holiday Balance: | 10.00 Hours | Optional Holiday Taken: | 30.00 Hours |
| Milestone Opt Holiday Balance: | 8.00 Hours | | |
| Vacation Bank Balance: | 0.00 Hours | | |
| Vacation-Carry Over Balance: | 0.00 Hours | | |
| Vacation Balance: | 0.00 Hours | | |



| Employee Name: | Diandre T Mentor | Pay Date: | 7/18/2025 |
| Employee #: | 0193630 | Pay Period: | 6/29/2025 - 7/12/2025 |
| Employee Address: | 20615 Jacaranda Rd Miami, FL 33189 | Deposit Advice #: | 979609856 |
| Department: | Kinetic | Pay Frequency: | Bi-Weekly |
| Job Title: | Res Inside Sales Consultant | Pay Rate: | 15.5250 |
| | | Federal Filing Status: | Single |
| | | Federal 2c/Extra Withholding: | No/$0.00 |
| | | State Filing Status: | (FL) |
| | | State Exemptions: | (FL) |

**Employer Name:** Windstream Services, LLC
**Employer Phone:** 855-411-6947
**Employer Address:** 4005 N Rodney Parham Road
Little Rock, AR 72212

| | Current 6/29/2025 - 7/12/2025 | | | YTD As of 7/12/2025 | |
|---|---|---|---|---|---|
| | Hours/Units | Rate | Amount | Hours/Units | Amount |
| **Earnings** | **88.5000** | | **$1,565.31** | **1,235.0000** | **$24,251.90** |
| Regular Wages | 72.0000 | 15.5250 | $1,117.80 | 916.0000 | $13,924.80 |
| Overtime | 8.0000 | 23.2875 | $186.30 | 28.0000 | $640.93 |
| Overtime | 0.5000 | 24.0638 | $12.03 | | |
| Vacation | | | | 120.0000 | $1,842.00 |
| Holiday | 8.0000 | 15.5250 | $124.20 | 42.0000 | $634.20 |
| Holiday Worked | | | | 20.0000 | $450.00 |
| Optional Holiday | | | | 50.0000 | $765.75 |
| Sick | | | | 40.0000 | $600.00 |
| Differential | 80.5000 | 1.5525 | $124.98 | 953.4935 | $1,448.71 |
| Commission | | | | | $3,904.70 |
| FLSA | | | | 19.0000 | $40.81 |
| **Taxes** | | | **$229.17** | | **$3,979.41** |
| Fed W/H | | | $109.43 | | $2,124.14 |
| FICA EE | | | $97.05 | | $1,503.62 |
| Fed MWT EE | | | $22.69 | | $351.65 |
| **Post-Tax Deductions** | | | **$9.47** | | **$142.05** |
| Supplemental Accident Plan | | | $3.81 | | $57.15 |
| Supplemental Critical Illness | | | $5.66 | | $84.90 |
| **Net Pay** | Routing # | Account # | Amount | | Amount |
| Direct Deposit | 063107513 | XXXXXX0732 | **$1,326.67** $1,326.67 | | **$20,130.44** |

| **Accruals & Balances** | |
|---|---|
| Optional Holiday Balance: | 10.00 Hours |
| Milestone Opt Holiday Balance: | 8.00 Hours |
| Vacation Bank Balance: | 0.00 Hours |
| Vacation-Carry Over Balance: | 0.00 Hours |
| Vacation Balance: | 0.00 Hours |

dayforce

Page 1 of 1























































**TamboWorks**
@TamboWorks

**Follow**

No one at @fi_mia Founder Institute Program wants to call it a night. The #startup energy is sizzling!

















**U.S. Department of Justice**
Office of Justice Programs
*National Institute of Justice*



# NATIONAL INSTITUTE OF JUSTICE

## FIVE THINGS ABOUT



## Deter would-be criminals by using scientific evidence about human behavior and perceptions about the costs, risks and rewards of crime.

### 1. The *certainty* of being caught is a vastly more powerful deterrent than the punishment.

Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment.

### 2. Sending an individual convicted of a crime to prison isn't a very effective way to deter crime.

Prisons are good for punishing criminals and keeping them off the street, but prison sentences (particularly long sentences) are unlikely to deter future crime. Prisons actually may have the opposite effect: Inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment.

See "Understanding the Relationship Between Sentencing and Deterrence" for additional discussion on prison as an ineffective deterrent.

### 3. Police deter crime by increasing the perception that criminals will be caught and punished.

The police deter crime when they do things that strengthen a criminal's perception of the certainty of being caught. Strategies that use the police as "sentinels," such as hot spots policing, are particularly effective. A criminal's behavior is more likely to be influenced by seeing a police officer with handcuffs and a radio than by a new law increasing penalties.

### 4. Increasing the severity of punishment does little to deter crime.

Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes.

More severe punishments do not "chasten" individuals convicted of crimes, and prisons may exacerbate recidivism.

See "Understanding the Relationship Between Sentencing and Deterrence" for additional discussion on the severity of punishment.

### 5. There is no proof that the death penalty deters criminals.

According to the National Academy of Sciences, "Research on the deterrent effect of capital punishment is uninformative about whether capital punishment increases, decreases, or has no effect on homicide rates."

*In his 2013 essay, "Deterrence in the Twenty-First Century," Daniel S. Nagin succinctly summarized the current state of theory and empirical knowledge about deterrence. The information in this publication is drawn from Nagin's essay with additional context provided by NIJ and is presented here to help those who make policies and laws that are based on science.*

Source: Daniel S. Nagin, "Deterrence in the Twenty-First Century," in *Crime and Justice: A Review of Research*, vol. 42: Crime and Justice in America: 1975-2025, ed. Michael Tonry, Chicago: University of Chicago Press, 2013.[1]

**The content on this page is not intended to create, does not create, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal.**

Findings and conclusions of the research reported here are those of the authors and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

*NIJ*.OJP.GOV | *National Institute of Justice*
STRENGTHEN SCIENCE   ADVANCE JUSTICE

**Five Things About Deterrence**

NIJ's "Five Things About Deterrence" summarizes a large body of research related to deterrence of crime into five points. Two of the five things relate to the impact of sentencing on deterrence — "Sending an individual convicted of a crime to prison isn't a very effective way to deter crime" and "Increasing the severity of punishment does little to deter crime." Those are simple assertions, but the issues of punishment and deterrence are far more complex. This addendum to the original "Five Things" provides additional context and evidence regarding those two statements.

It is important to note that while the assertion in the original "Five Things" focused only on the impact of sentencing on deterring the commission of future crimes, a prison sentence serves two primary purposes: punishment and incapacitation. Those two purposes combined are a linchpin of United States sentencing policy, and those who oversee sentencing or are involved in the development of sentencing policy should always keep that in mind.

**"Sending an individual convicted of a crime to prison isn't a very effective way to deter crime."**

Prison is an important option for incapacitating and punishing those who commit crimes, but the data show long prison sentences do little to deter people from committing future crimes.

Viewing the findings of research on severity effects in their totality, there is evidence suggesting that short sentences may be a deterrent. However, a consistent finding is that increases in already lengthy sentences produce at best a very modest deterrent effect.

A very small fraction of individuals who commit crimes — about 2 to 5 percent — are responsible for 50 percent or more of crimes.[2] Locking up these individuals when they are young and early in their criminal careers could be an effective strategy to preventing crime if we could identify who they are. The problem is: we can't. We have tried to identify the young people most likely to commit crimes in the future, but the science shows we can't do it effectively.

It is important to recognize that many of these individuals who offend at higher rates may already be incarcerated because they put themselves at risk of apprehension so much more frequently than individuals who offend at lower rates.

**"Increasing the severity of punishment does little to deter crime."**

To clarify the relationship between the severity of punishment and the deterrence of future crimes, you need to understand:

- The lack of any "chastening" effect from prison sentences,
- That prisons may exacerbate recidivism,
- The different impacts of the certainty versus the severity of punishment on deterrence, and
- That individuals grow out of criminal activity as they age.

*More severe punishments do not "chasten" individuals convicted of crimes.*

Some policymakers and practitioners believe that increasing the severity of the prison experience enhances the "chastening" effect, thereby making individuals

> ### Deterrence and Incapacitation
>
> There is an important distinction between deterrence and incapacitation. Individuals behind bars cannot commit additional crime — this is incarceration as incapacitation. Before someone commits a crime, he or she may fear incarceration and thus refrain from committing future crimes — this is incarceration as deterrence.

convicted of an offense less likely to commit crimes in the future. In fact, scientists have found no evidence for the chastening effect.

*Prisons may exacerbate recidivism.*

Research has found evidence that prison can exacerbate, not reduce, recidivism. Prisons themselves may be schools for learning to commit crimes. In 2009, Nagin, Cullen and Jonson published a review of evidence on the effect of imprisonment on reoffending.[3] The review included a sizable number of studies, including data from outside the U.S. The researchers concluded:

> "… compared to non-custodial sanctions, incarceration has a null or mildly criminogenic impact on future criminal involvement. We caution that this assessment is not sufficiently firm to guide policy, with the exception that it calls into question wild claims that imprisonment has strong specific deterrent effects."

*Certainty has a greater impact on deterrence than severity of punishment.*

*Severity* refers to the length of a sentence. Studies show that for most individuals convicted of a crime, short to moderate prison sentences may be a deterrent but longer prison terms produce only a limited deterrent effect. In addition, the crime prevention benefit falls far short of the social and economic costs.

*Certainty* refers to the likelihood of being caught and punished for the commission of a crime. Research underscores the more significant role that *certainty* plays in deterrence than severity — it is the certainty of being caught that deters a person from committing crime, not the fear of being punished or the severity of the punishment. Effective policing that leads to swift and certain (but not necessarily severe) sanctions is a better deterrent than the threat of incarceration. In addition, there is no evidence that the deterrent effect increases when the likelihood of conviction increases. Nor is there any evidence that the deterrent effect increases when the likelihood of imprisonment increases.

*A person's age is a powerful factor in deterring crime.*

Even those individuals who commit crimes at the highest rates begin to change their criminal behavior as they age. The data show a steep decline at about age 35.[4] A more severe (i.e., lengthy) prison sentence for convicted individuals who are naturally aging out of crime does achieve the goal of punishment and incapacitation. But that incapacitation is a costly way to deter future crimes by aging individuals who already are less likely to commit those crimes by virtue of age.

---

1. "Five Things About Deterrence" is available at https://ncjrs.gov/pdffiles1/nij/247350.pdf.
2. Mulvey, Edward P., *Highlights from Pathways to Desistance: A Longitudinal Study of Serious Adolescent Offenders,* Juvenile Justice Fact Sheet, Washington, DC: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention, March 2011, NCJ 230971. Available at https://www.ncjrs.gov/pdffiles1/ojjdp/230971.pdf.

3. Nagin, Daniel S., Francis T. Cullen and Cheryl Lero Johnson, "Imprisonment and Reoffending," *Crime and Justice: A Review of Research,* vol. 38, ed. Michael Tonry, Chicago: University of Chicago Press, 2009: 115-200.
4. Sampson, Robert. J., John H. Laub and E.P. Eggleston, "On the Robustness and Validity of Groups," *Journal of Quantitative Criminology* 20 (1) (2004): 37-42.

**NIJ.OJP.GOV** | **National Institute of Justice**
STRENGTHEN SCIENCE. ADVANCE JUSTICE.







## Why Incarceration Is Not the Best Way to Keep Communities Safe

Community Corrections Collaborative Network

The Community Corrections Collaborative Network (CCCN) is comprised of the leading associations representing 90,000-plus probation, parole, pretrial, and treatment professionals around the country, including the American Probation and Parole Association (APPA), the Association of Paroling Authorities International (APAI), the Federal Probation and Pretrial Officers Association (FPPOA), the International Community Corrections Association (ICCA), the National Association of Drug Court Professionals (NADCP), the National Association of Pretrial Services Agencies (NAPSA), and the National Association of Probation Executives (NAPE).

# Introduction

Given the rate of incarceration in the United States, policymakers and the public are increasingly aware of, and concerned about, the implications of crime policies resulting in the unnecessary use of incarceration. In fact, the United States is the world leader in per capita incarceration rates. More than 2.2 million adult men and women occupy cells in America's prisons and jails—a striking 910 adults for every 100,000 U.S. residents, or 1 out of every 110 adults (Glaze & Kaeble, 2014). The nation's high incarceration rate disproportionately impacts racial minorities: 1 out of every 15 black men ages 18 or older is behind bars (Pew Center on the States, 2008), and black males between the ages of 6 and 64 are five to seven times more likely to be incarcerated than white men of the same age (Carson & Sabol, 2012).

In 2014, more than 636,000 people were released from state and federal institutions (Carson, 2015)—approximately 1,750 per day—while another 11.4 million are processed through our local jails each year (Federal Interagency Reentry Council, 2015).

An even greater number of people are under correctional control in the community: in 2014, an estimated 4.7 million adults were on community supervision, or 1 in every 52 adults. Of these, more than 3.8 million were on probation and more than 855,000 were on parole or another form of post-release supervision (Kaeble, Maruschak, & Bonczar, 2015).

Crime also has significant fiscal impact. Considering the cost of state prison alone, the total taxpayer cost of 40 state prisons that participated in a 2011 study was $39 billion, or an average of $31,286 for each of the 1.2 million inmates in those states. The $39 billion cost is $5.4 million more than these states' combined $33.5 billion corrections budgets for prisons. It includes costs such as those for in-prison education and training programs, hospital and other health care for inmates, capital costs, employee benefits, and underfunded pensions and retiree health care benefits for corrections employees that, depending on the state, may be paid by other departments (Henrichson & Delaney, 2012).

Research suggests that incarceration does little to change a person's behavior. National studies (see, e.g., Durose, Cooper, & Snyder, 2014) indicate that 68% of state prisoners are rearrested within 3 years of their release, and 77% are rearrested within 5 years. Of those, nearly half—45%—are reincarcerated.

These high rates of rearrest and reincarceration translate to more victims, racial and ethnic disparities, an escalation of correctional and justice system costs, and a cycle of challenges for those who enter the justice system and struggle to stay out.

**Community corrections** refers to agencies that supervise individuals who are in the community under the control of the justice system. These individuals include people who are released on pretrial supervision, those who participate in diversionary programs and services, those who are sentenced to a term of probation or other form of community supervision following their conviction, and those who are released from confinement under some form of parole or other form of post-release supervision.

Over the past three decades, researchers in the U.S., Canada, and abroad have conducted extensive studies in an effort to identify more effective ways to improve outcomes for those involved in the justice system. Indeed, while there remains much to understand about the pathways to criminal and delinquent behavior and the strategies that will result in desistance, there is much we do know about community corrections and effective interventions that reduce recidivism.

The term "risk," as used in the context of this paper, refers to the likelihood of any type of future criminal behavior, and should not be equated with risk of violence or dangerousness. Furthermore, risk of new criminal behavior and risk of violence/dangerousness should be distinguished from risk of failure in standard treatment.

Based upon several decades of correctional research, community corrections agencies have made significant changes in the ways they manage those under their supervision. Researchers have identified strategies that produce positive results in terms of reducing recidivism. These research-based findings are referred to as "evidence-based principles," "evidence-based practices," "what works," and "effective interventions." At the core of these effective interventions are three principles: *risk, need,* and *responsivity*. The best outcomes are derived when community corrections implements these three principles with fidelity.[1]

The "risk principle" holds that programming should be matched to a person's assessed level of risk to reoffend; those at higher risk need higher levels of intervention to reduce their likelihood of reoffense (see, e.g., Andrews & Bonta, 2010; Lowenkamp, Latessa, & Holsinger, 2006). It is important to point out that risk of failure in standard treatment is not the same as risk of violence or dangerousness. Research has also shown that offering services to individuals without regard to risk level generally fails to reduce recidivism and, particularly for low risk individuals, may actually result in increased recidivism (see, e.g., Andrews & Bonta, 2010; Lowenkamp, Latessa, & Holsinger, 2006; Lowenkamp, Latessa, & Smith, 2006; Lowenkamp, Pealer, Smith, & Latessa, 2006).

The "need principle" states that, to reduce the likelihood of future illegal behavior, interventions should focus on those changeable traits (e.g., coping skills, use of alcohol/drugs) that influence criminal behavior rather than on those that do not. These crime-influencing risk factors are referred to as "criminogenic needs" (Andrews & Bonta, 2010; Andrews et al., 1990).

The "responsivity principle" posits that the success of interventions depends on delivering them in ways that are most likely to engage people and facilitate meaningful change, and on matching the right program to the person based on his or her individual traits (see, e.g., Andrews & Bonta, 2010).

The number of people in this country involved with the criminal justice system—either in community corrections or incarcerated—places unsustainable burdens on the justice system. It is no wonder that criminal justice reform is a common topic of discussion among lawmakers, citizens, and justice system professionals alike. Despite the increased attention to the issue, many continue to hold beliefs about incarceration and community corrections that are not supported by research. This paper briefly explores some of the common myths about incarceration and community corrections and dispels those myths with research-informed facts.

---

[1] "Fidelity" is the degree to which an intervention is delivered as intended.

**Myth&Fact**

# 1

Myth 1: "The use of jail and prison is the best way to prevent crime."

**Fact 1: While jail and prison do indeed prevent crime while people are incarcerated, once released, incarceration has, at best, a negligible impact on crime prevention and, at worst, is crime-producing.**

While a sentence of jail or prison removes individuals from the community and, in this regard, prevents crime against the general public through incapacitation, research is clear that incapacitating people is unlikely to deter them from committing crimes in the future. In fact, research suggests that, for many, the experience of being in jail or prison will actually increase the likelihood that they will reoffend following their confinement.

**Finding 1: Those confined to prison recidivate at a much higher rate than those sentenced to community corrections.** A review of empirical studies by Durlauf and Nagin (2011) concluded: "The experience of imprisonment compared with non-custodial sanctions such as probation, sometimes called specific deterrence, does not seem to prevent reoffending. Instead, the evidence suggests the possibility of a criminogenic effect from imprisonment" (p. 14). Illustrating this conclusion, Bales & Piquero (2012) compared the recidivism patterns of 79,000 individuals convicted of felonies sentenced to a Florida state prison with the recidivism patterns of 65,000 people sentenced to a community-based program. Controlling for a range of variables (e.g., sex, race, age, index offense, criminal history, sentence recommendation) and applying multiple statistical techniques, the researchers determined that imprisonment was found to exert a crime-producing effect, with those who had been incarcerated recidivating at a much higher rate (15.4%) within 3 years of their release compared to those who were sentenced to community corrections.

**Finding 2: Incarceration can actually *increase* recidivism.** Jonson (2010) conducted a meta-analysis[2] of 85 studies examining the effects of custodial sanctions (i.e., jail, prison). The study controlled for a number of variables (e.g., age, risk level, etc.)[3] and determined that compared to nonincarcerative sentences (e.g., probation, home confinement, or diversion to treatment), custodial sanctions increased post-release offending by 14%. Moreover, placement in harsher confinement conditions (e.g., prison vs. residential programs) was associated with a 15% increase in recidivism.

**Finding 3: The vast majority of people in jails and prisons do not receive the treatment and services they need to live a crime-free lifestyle.** A report from the Bureau of Justice Statistics (James & Glaze, 2006) found that more than half of all prison and jail inmates had a mental health problem, but only 17% – 34% of them received mental health treatment following admission (34% of state prisoners, 24% of federal prisoners, and just 17% of jail inmates). In addition, of the 1.5 million inmates who met the DSM[4] criteria for

---

[2] A meta-analysis statistically averages the effects of an intervention across numerous studies that are all rated as being scientifically acceptable or strong.

[3] Controlling for variables is a critical step in research. Doing so enables researchers to compare, in the case of justice-involved individuals, the effects of different punishments, or sanctions, and other interventions on similarly situated individuals.

[4] The DSM, or Diagnostic and Statistical Manual of Mental Disorders, is the standard classification of mental disorders used by mental health and other health professionals in the United States and many other countries.

substance abuse or addiction, only 11% received any treatment during their incarceration (National Center on Addiction and Substance Abuse, 2010). This corresponds to more than 650,000 inmates released back into the community each year without having received these critical treatment services (National Institute on Drug Abuse, 2011).

**Finding 4: Harsh penalties do not improve long-term outcomes.** Gendreau and Goggin (1996) conducted a meta-analysis of more than 400 studies that examined the effects of punishment on recidivism. They found that harsher forms of punishment produced almost identical effects on recidivism as compared to reduced punishment or no punishment at all. In their review of the literature on punishment, Doob and Webster (2003) concluded the following: "Consistent with the findings of other comprehensive summaries, no convincing evidence was found to suggest that crime can be reduced by harsh sentences. It is true that one can never prove the absence of a phenomenon. However, the enormous efforts which have been expended over the past 30 years to find the opposite—that is, consistent deterrent effects [of harsher punishment]— have proven unsuccessful (Center of Criminology, University of Toronto, 2003, Item 1).

**Finding 5: Research on longer prison sentences is mixed; studies show increased recidivism under most circumstances.** In their meta-analysis of 117 studies involving 442,471 individuals, Smith, Goggin, and Gendreau (2002) determined that longer time periods in prison (in comparison to shorter time periods in prison) were associated with an *increase* in recidivism. These effects held when controlling for gender, adults versus juveniles, race, and risk levels. It should be noted that Meade, Steiner, Makarios, and Travis (2013) showed that prison terms of 5 or more years were associated with a reduction in the likelihood of recidivism; however, the authors acknowledge that "offenders who have served longer periods of time may simply have aged out[5] of crime by the time they are released" (p. 543). Jonson's meta-analysis of 85 studies (2010) found that sentence length was associated with greater recidivism for all types of offenders *with the exception of sex offenders.*

**Finding 6: Confinement for technical supervision violations[6] has been found to increase recidivism.** Drake & Aos (2012) conducted a study to determine the effects of various sanctions—ranging from verbal reprimands to confinement—used when individuals violate technical conditions of a community sentence (e.g., failing to report to their supervising officer, neglecting to pay legal financial obligations, etc.). After controlling for age, gender, race, and risk level, it was found that those who received confinement as a sanction were nearly 19% more likely to commit a felony offense in the follow-up period than those sentenced to community supervision.

---

[5] The risk of crime declines naturally as people age. This "aging out" phenomenon may be due to hormonal or neurological changes, brain maturation or degradation, physical infirmity, etc.

[6] "Technical violations" are rule infractions that are non-criminal matters, such as failing to appear for scheduled appointments, failing to comply with court-ordered treatment, etc.

**Myth&Fact**

2

## Myth 2: "Community corrections does not work."

**Fact 2: Community corrections has been shown to be effective in reducing future criminal activity by 10 to 30%.**

Researchers have demonstrated that community corrections can greatly reduce the risk of recidivism, especially when strategies based on core correctional practices[7] and the risk/need/responsivity principles are used. According to the risk principle, more intensive levels of treatment are most effective with higher risk people; according to the need principle, intervention efforts should target multiple criminogenic needs; and according to the responsivity principle, effective interventions are those that are responsive to the motivation, cognitive ability, and other characteristics of the individual (Andrews, 2007; Andrews et al., 1990).

**Finding 7: Community supervision programs can reduce the risk of recidivism by 10 to 30%.**
A meta-analysis of more than 100 correctional programs and treatment research studies found that recidivism is reduced by 10 to 30% on average[8] when attention is paid to criminogenic needs (Andrews, 2007). In particular, studies consistently demonstrate the effectiveness of cognitive-behavioral treatments[9] (Andrews & Bonta, 2010; Lipsey, Landenberger, & Wilson, 2007). These strategies assist offenders with changing harmful thinking patterns and attitudes, as well as developing prosocial skills. Further, recidivism reduction effects have been determined to be greater when services and interventions are delivered in the community rather than in residential/institutional settings (Andrews, 2007).

**Finding 8: Treatment services can reduce recidivism by 10 to 30%.** A summary of 30 meta-analyses (McGuire, 2002) found that treatment reduces recidivism by 10%, with slightly better outcomes when services are matched to the individual's unique traits (i.e., when the responsivity principle is followed). Other studies have demonstrated stronger results—up to 30%—when medium and high risk individuals receive appropriate behavior changing programming (Andrews, 2007; Andrews & Bonta, 2010; Andrews, Bonta, & Wormith, 2006; Andrews & Dowden, 2007; Andrews, Dowden, & Gendreau, 1999; Bonta, 2007; Dowden, 1998; Gendreau, Goggin, & Little, 1996; Lipsey & Cullen, 2007).

**Finding 9: The use of core correctional practices delivered in the community contributes to recidivism reduction.** A meta-analysis (Dowden & Andrews, 2004) of several hundred studies found that better outcomes were achieved when core correctional practices—for example, effective modeling and reinforcing prosocial attitudes, teaching concrete problem solving skills, and building a professional relationship that allows for open communication and respect—were used, particularly in combination with the risk, need, and responsivity principles.

[7] "Core correctional practices" are evidence-based risk-reducing strategies that include developing a strong professional alliance with justice-involved individuals; modeling and reinforcing prosocial attitudes and behaviors; creating opportunities to teach concrete skills such as problem solving, impulse control, and anger management; allowing for practice and rehearsal of newly learned skills; and using reinforcers and responses to noncompliant behavior effectively.

[8] A meta-analysis reveals an average effect size. Effect size ranges are contingent upon the effectiveness of implementation.

[9] "Cognitive behavioral treatments" are programs and services that aim to help justice-involved individuals understand the relationship between their thoughts and beliefs, feelings, and behaviors, and to learn prosocial ways of thinking and behaving. Examples of such programs include Moral Reconation Therapy (MRT), Reasoning and Rehabilitation (R&R), and Thinking for a Change (T4C).

**Finding 10: Individuals supervised by probation officers who receive risk/need/responsivity training are reconvicted at lower rates than their untrained counterparts.** A study (Bonta et al., 2011) that evaluated the effectiveness of a training program for probation officers grounded in the rehabilitative model of intervention and the risk, need, and responsivity principles showed that, relative to a control group, probation officers in the training group spent more time focusing on criminogenic needs and proportionally less time discussing noncriminogenic needs and probation conditions. After a 2-year fixed follow-up period, individuals who were on the caseloads of the trained officers had a reconviction rate that was 15% lower than those on the caseloads of their untrained counterparts. In a subsequent study, Bonta and colleagues (2008) determined sharp reductions in recidivism (26.5%) when trained officers devoted 20 minutes or more of appointment time to addressing criminogenic needs.

## Myth & Fact

# 3

**Myth 3: "Community supervision is soft on crime."**

**Fact 3: Individuals under community supervision reported that "doing time" is easier than having to abide by their release requirements.**

Although most law-abiding individuals may regard treatment and community supervision as desirable alternatives to confinement, those engaged in criminal wrong-doing report otherwise. In fact, surveys suggest that some justice-involved individuals view community-based sanctions as more onerous than jail or prison.

**Finding 11: Treatment-oriented sanctions are perceived to be punitive by justice-involved individuals.** Various studies (see, e.g., Crouch, 1993; Petersilia & Deschenes, 1994; Spelman, 1995; Wood & Grasmick, 1999) have concluded that many law-breakers do not view jail as being substantially more punitive than community-based interventions, such as community service or electronic monitoring. A survey of probationers and parolees (Wodahl, Ogle, Kadleck, & Gerow, 2009) found that they viewed nonincarcerative, treatment-oriented responses—such as completing writing assignments, participating in treatment, or providing community service—substantially more punitive than jail. Another study found that "75% of offenders rated one or more intermediate sanctions[10] as more severe than an incarcerative sanction" (Spelman, 1995, p. 107).

**Finding 12: Repeat prison-goers are less likely to view prison as punitive.** Several studies (Crouch, 1993; May & Wood, 2005; May, Wood, Mooney, & Minor, 2005; Wood & May, 2003) have demonstrated that those who have had repeat experiences with prison confinement view prison as less punitive than those with less prison experience.

---

[10]"Intermediate sanctions" are non-custodial justice system responses such as halfway houses, home confinement, and intensive supervision.

**Myth**&**Fact**

# 4

Myth 4: "Crime victims don't support rehabilitation and treatment."

**Fact 4: Crime victims do not want new victims and support rehabilitation, perhaps even
more so than the general public.**

Justice system decision makers at both the policy and individual case level are informed by many factors,
including and especially the public's view on crime and punishment. To be sure, policy- and decision-makers
seek to advance the interests of the public in general, and the victims of crime specifically. In this regard, the
opinions and perspectives of the general citizenry, alongside those of crime victims, create a fundamentally
important context for these decisions. Contrary to the perception that those who perpetrate crime should be
"put away," the majority of the American public favors community corrections for those who commit non-
violent crime and generally support rehabilitative approaches.

**Finding 13: A majority of the American public favors alternatives to incarceration.** Eighty-seven
percent of respondents in one national survey indicated they would be more likely to support alternatives to
incarceration for non-violent justice-involved individuals (40% when it comes to a violent crime) if research
consistently showed there are ways other than incarceration to reduce the likelihood that they will commit
new crimes (National Institute of Corrections [NIC], n.d.). A review of more than 50 public opinion research
studies conducted since 2000 demonstrates growing and broad support for alternatives to incarceration,
rehabilitation, and treatment (Opportunity Agenda, 2014). Eighty-four percent of respondents from one
study support alternatives to prison (such as drug treatment, community service, or probation) for nonviolent
offenses (Lake, Gotoff, & Pultorak, 2013).

**Finding 14: The public favors spending resources on rehabilitative services.** Seventy-four percent of
respondents in a national survey agreed with the statement "We should increase spending on approaches
proven to reduce the chances that offenders will commit new crimes" (NIC, n.d.). Over 90% of respondents
in a national public opinion poll felt that job training, drug treatment, mental health services, family support,
mentoring, and housing should be offered to prisoners (Krisberg & Marchionna, 2006).

**Finding 15: Fifty-one percent of U.S. voters believe too many people are in prison.** According to
a report published by The Opportunity Agenda (2014), most U.S. voters agree that the country relies too
heavily on incarceration.

**Finding 16: Crime survivors are more likely than the general citizenry to support rehabilitation.**
According to a study conducted by Peter D. Hart Research Associates, Inc. (2002), 60% of crime victims
compared to 52% of those who were not crime victims said that prevention and rehabilitation should be
the top goal of the justice system. In addition, nearly three-quarters of surveyed crime survivors (73%,
compared to 64% of those who were not crime victims) indicated that the best way to reduce crime is
through rehabilitation.

**Finding 17: By large majorities, victims specifically prefer investments in mental health, drug treatment, and supervised probation over incarceration.** In a survey of more than 2,300 California crime victims (Californians for Safety and Justice, 2013), more victims say that "too many" people are sent to prison rather than "too few." Victims participating in this study further indicated that they wanted a focus on supervised probation and rehabilitation by a 2:1 margin over prisons and jails. Investments in mental health and drug treatment were preferred by victims by a 7:1 margin over incarceration.

## Myth&Fact

# 5

**Myth 5: "Effective community corrections programs are expensive."**

**Fact 5: The more communities invest in effective treatment, social services, and community supervision, the greater their financial return on investment.**

Not only do community corrections programs achieve better results and have greater public and victim support, but they also cost significantly less than incarceration and demonstrate a greater return on investment.

**Finding 18: The cost of state prison is 10 to 20 times greater than the cost of community corrections.** In a study of 33 states, the average prison inmate cost was $79/day (or nearly $29,000/year), while the average cost for managing individuals in the community was $3.42/day for probation supervision and $7.47/day for parole supervision (or about $1,250 to $2,750/year, respectively; Pew Charitable Trusts, n.d.). Similarly, in the U.S. federal system, the cost of prison confinement is eight times greater than the cost of community supervision. In 2012, the annual cost of housing an inmate in federal prison was just under $29,000 compared to just over $3,200 to provide federal probation supervision services (United States Courts, 2013).

**Finding 19: The net value of the average targeted, evidence- and community-based adult correctional program is $11,150[11] per adult offender.** Washington State Institute for Public Policy (WSIPP; 2016) has conducted research to help policy-makers identify strategies that deliver better outcomes per dollar of taxpayer spending. Twenty-five community-based programs were evaluated to determine return on investment. Net values (the cost of an intervention less the savings derived from preventing future crime) were computed using a cost/benefit formula. Benefits minus costs ranged from +$188 to $26,863 per participant, and the benefit per $1.00 of cost ranged from a low of $1.18 to a high of $24.19.

**Finding 20: The financial benefits of some community-based programs and services has a 100% likelihood of outweighing their costs.** A cost–benefit review of evidence-based and research-based programs for adult community corrections showed, among other findings, that cognitive-behavioral treatment has a total per participant benefit of $10,050; outpatient/non-intensive drug treatment has total benefits of $14,125; and risk, need, and responsivity supervision for high and moderate risk offenders has total benefits of $12,121, with each of these services determined to have a 100% likelihood that benefits will exceed costs (WSIPP, 2016).

---

[11] Calculation based upon the average "Total Benefits Minus Costs" of evaluated community-based programs.

## 5 Facts, 1 Bottom Line

| 1 | While jail and prison do indeed prevent crime while people are locked up, once released, incarceration has, at best, a negligible impact on crime prevention and, at worst, is crime-producing. |
| 2 | Community corrections has been shown to be effective in reducing future criminal activity by 10 to 30%. |
| 3 | Individuals under community supervision reported that "doing time" is easier than having to abide by their release requirements. |
| 4 | Crime victims do not want new victims and support rehabilitation, perhaps even more so than the general public. |
| 5 | The more communities invest in effective treatment, social services, and community supervision, the greater their financial return on investment. |

**The bottom line:**

While incarceration serves as an important public safety tool for some, community corrections options produce more effective and less expensive results for many.

# References

Andrews, D. A. (2007). Principles of effective correctional programs. In L. L. Motiuk & R. C. Serin (Eds.), *Compendium 2000 on effective correctional programming.* Retrieved from Correctional Service Canada website: http://www.csc-scc.gc.ca/text/rsrch/compendium/2000/index-eng.shtml

Andrews, D. A., & Bonta, J. (2010). *The psychology of criminal conduct* (5th ed.). Cincinnati, OH: Anderson.

Andrews, D. A., Bonta, J., & Wormith, J. S. (2006). The recent past and near future of risk and/or need assessment. *Crime & Delinquency, 52,* 7–27. http://dx.doi.org/10.1177/0011128705281756

Andrews, D. A., & Dowden, C. (2007). The risk-need-responsivity model of assessment and human service in prevention and corrections: Crime-prevention jurisprudence. *Canadian Journal of Criminology and Criminal Justice, 49,* 439–464. http://dx.doi.org/10.3138/cjccj.49.4.439

Andrews, D. A., Dowden, C., & Gendreau, P. (1999). *Clinically relevant and psychologically informed approaches to reduced reoffending: A meta-analytic study of human service, risk, need, responsivity, and other concerns in justice contexts* (Unpublished manuscript). Ottawa, Canada: Carleton University.

Andrews, D. A., Zinger, I., Hoge, R. D., Bonta, J., Gendreau, P., & Cullen, F. T. (1990). Does correctional treatment work? A clinically relevant and psychologically informed meta-analysis. *Criminology, 28,* 369–404. http://dx.doi.org/10.1111/j.1745-9125.1990.tb01330.x

Bales, W. D., & Piquero, A. R. (2012). Assessing the impact of imprisonment on recidivism. *Journal of Experimental Criminology, 8,* 71–101. http://dx.doi.org/10.1007/s11292-011-9139-3

Bonta, J. (2007). Offender assessment: General issues and considerations. In L. L. Motiuk & R. C. Serin (Eds.), *Compendium 2000 on effective correctional programming.* Retrieved from Correctional Service Canada website: http://www.csc-scc.gc.ca/005/008/compendium/2000/chap_4-eng.shtml

Bonta, J., Bourgon, G., Rugge, T., Scott, T.-L., Yessine, A. K., Gutierrez, L., & Li, J. (2011). An experimental demonstration of training probation officers in evidence-based community supervision. *Criminal Justice and Behavior, 38,* 1127–1148. http://dx.doi.org/10.1177/0093854811420678

Bonta, J., Rugge, T., Scott, T.-L., Bourgon, G., & Yessine, A. K. (2008). Exploring the black box of community supervision. *Journal of Offender Rehabilitation, 47,* 248–270. http://dx.doi.org/10.1080/10509670802134085

Californians for Safety and Justice. (2013). *California crime victims' voices: Findings from the first-ever survey of California crime victims and survivors.* Retrieved from http://libcloud.s3.amazonaws.com/211/72/d/228/2/VictimsReport_07_16_13.pdf

Carson, E. A. (2015, September). *Prisoners in 2014* (NCJ 248955). Retrieved from Bureau of Justice Statistics website: http://www.bjs.gov/content/pub/pdf/p14.pdf

Carson, E. A., & Sabol, W. J. (2012, December). *Prisoners in 2011* (NCJ 239808). Retrieved from Bureau of Justice Statistics website: http://www.bjs.gov/content/pub/pdf/p11.pdf

Center of Criminology, University of Toronto. (2003, December). The imposition of harsher sentences does not deter crime [Highlight of the paper "Sentence Severity and Crime: Accepting the Null Hypothesis" by A. N. Doob & C. M. Webster in *From Crime and Justice: A Review of Research,* edited by M. Tonry]. *Criminological Highlights, 6*(2), Item 1.

Crouch, B. M. (1993). Is incarceration really worse? Analysis of offenders' preferences for prison over probation. *Justice Quarterly, 10,* 67–88. http://dx.doi.org/10.1080/07418829300091711

Doob, A. N., & Webster, C. M. (2003). Sentence severity and crime: Accepting the null hypothesis. In M. Tonry (Ed.), *From crime and justice: A review of research* (Vol. 30, pp. 143–195). Chicago, IL: University of Chicago Press.

Dowden, C. (1998). *A meta-analytic examination of the risk, need and responsivity principles and their importance within the rehabilitation debate* (Unpublished master's thesis). Ottawa, Canada: Carleton University.

Dowden, C., & Andrews, D. A. (2004). The importance of staff practice in delivering effective correctional treatment: A meta-analytic review of core correctional practice. *International Journal of Offender Therapy and Comparative Criminology, 48,* 203–214. http://dx.doi.org/10.1177/0306624x03257765

Drake, E. K., & Aos, S. (2012). *Confinement for technical violations of community supervision: Is there an effect on felony recidivism?* (Document No. 12-07-1201). Retrieved from Washington State Institute for Public Policy website: http://www.wsipp.wa.gov/ReportFile/1106

Durlauf, S. N., & Nagin, D. S. (2011). Imprisonment and crime: Can both be reduced? *Criminology & Public Policy, 10,* 13–54. http://dx.doi.org/10.1111/j.1745-9133.2010.00680.x

Durose, M. R., Cooper, A. D., & Snyder, H. N. (2014, April). *Recidivism of prisoners released in 30 states in 2005: Patterns from 2005 to 2010* (NCJ 244205). Retrieved from Bureau of Justice Statistics website: http://www.bjs.gov/content/pub/pdf/rprts05p0510.pdf

Federal Interagency Reentry Council. (2015, August). *Overview.* Retrieved from https://csgjusticecenter.org/wp-content/uploads/2014/05/FIRC_Overview.pdf

Gendreau, P., & Goggin, C. (1996). Principles of effective programming with offenders. *Forum on Corrections Research, 8*(3), 38–40.

Gendreau, P., Goggin, C., & Little, T. (1996). *Predicting adult offender recidivism: What works!* (User Report No. 1996-07). Ottawa, Canada: Solicitor General of Canada.

Glaze, L. E., & Kaeble, D. (2014). *Correctional populations in the United States, 2013* (NCJ 248479). Retrieved from Bureau of Justice Statistics website: http://www.bjs.gov/content/pub/pdf/cpus13.pdf

Henrichson, C., & Delaney, R. (2012, July 20). *The price of prisons: What incarceration costs taxpayers.* Retrieved from Vera Institute of Justice website: http://archive.vera.org/sites/default/files/resources/downloads/price-of-prisons-updated-version-021914.pdf

James, D. J., & Glaze, L. E. (2006, September). *Mental health problems of prison and jail inmates* (NCJ 213600). Retrieved from Bureau of Justice Statistics website: http://www.bjs.gov/content/pub/pdf/mhppji.pdf

Jonson, C. L. (2010). *The impact of imprisonment on reoffending: A meta-analysis* (Doctoral dissertation). Retrieved from https://etd.ohiolink.edu/!etd.send_file?accession=ucin1285687754&disposition=inline

Kaeble, D., Maruschak, L., & Bonczar, T. P. (2015) *Probation and parole in the United States, 2014* (NCJ 24907). Retrieved from Bureau of Justice Statistics website: http://www.bjs.gov/content/pub/pdf/ppus14.pdf

Krisberg, B., & Marchionna, S. (2006, April). *Attitudes of US voters toward prisoner rehabilitation and reentry policies.* Retrieved from National Council on Crime and Delinquency website: http://www.nccdglobal.org/sites/default/files/publication_pdf/focus-reentry-and-rehab.pdf

Lake, C., Gotoff, D., & Pulotrak, K. (2013). *Reducing incarceration levels in the U.S.: Opportunities for reform.* New York, NY: Open Society Foundations.

Lipsey, M. W., & Cullen, F. T. (2007). The effectiveness of correctional rehabilitation: A review of systematic reviews. *Annual Review of Law and Social Science, 3,* 297–320. http://dx.doi.org/10.1146/annurev.lawsocsci.3.081806.112833

Lipsey, M. W., Landenberger, N. A., & Wilson, S. J. (2007). *Effects of cognitive-behavioral programs for criminal offenders* (Campbell Collaboration Systematic Reviews 2007-06). Retrieved from www.campbellcollaboration.org/lib/download/143/

Lowenkamp, C. T., Latessa E. J., & Holsinger, A. M. (2006). The risk principle in action: What have we learned from 13,676 offenders and 97 correctional programs? *Crime and Delinquency, 52,* 77–93. http://dx.doi.org/10.1177/0011128705281747

Lowenkamp, C. T., Latessa, E. J., & Smith, P. (2006). Does correctional program quality really matter? The impact of adhering to the principles of correctional intervention. *Criminology and Public Policy, 5,* 201–220. http://dx.doi.org/10.1111/j.1745-9133.2006.00388.x

Lowenkamp, C., Pealer, J., Smith, P., & Latessa, E. (2006). Adhering to the risk and need principles: Does it matter for supervision-based programs? *Federal Probation, 70*(3). Retrieved from United States Courts website: http://www.uscourts.gov/statistics-reports/publications/federal-probation-journal/federal-probation-journal-december-2006

May, D. C., & Wood, P. B. (2005). What influences offenders' willingness to serve alternative sanctions? *Prison Journal, 85,* 145–167. http://dx.doi.org/10.1177/0032885505276988

May, D. C., Wood, P. B., Mooney, J. L., & Minor, K. I. (2005). Predicting offender generated exchange rates: Implications for a theory of sentence severity. *Crime & Delinquency, 51,* 373–399. http://dx.doi.org/10.1177/0011128704271459

McGuire, J. (2002). Integrating findings from research reviews. In J. McGuire (Ed.), *Offender rehabilitation and treatment: Effective practice and policies to reduce re-offending.* Chichester, UK: Wiley.

Meade, B., Steiner, B., Makarios, M., & Travis, L. (2013). Estimating a dose–response relationship between time served in prison and recidivism. *Journal of Research in Crime and Delinquency, 50,* 525–550. http://dx.doi.org/10.1177/0022427812458928

National Center on Addiction and Substance Abuse. (2010, February 26). New CASA report finds: 65% of all U.S. inmates meet medical criteria for substance abuse addiction, only 11% receive any treatment. Retrieved from http://www.centeronaddiction.org/newsroom/press-releases/2010-behind-bars-II

National Institute of Corrections. (n.d.). *Evidence-based decision making in the criminal justice system: Key findings from a national public opinion survey.* Retrieved from http://ebdmoneless.org/wp-content/uploads/2015/12/EBDM-Public-Opinion-Fact-Sheet.pdf

National Institute on Drug Abuse. (2011, May). *Treating offenders with drug problems: Integrating public health and public safety.* Retrieved from http://www.ndcrc.org/content/treating-offenders-drug-problems-integrating-public-health-and-public-safety

Opportunity Agenda. (2014). *An overview of public opinion and discourse on criminal justice issues.* Retrieved from http://opportunityagenda.org/files/field_file/2014.08.23-CriminalJusticeReport-FINAL_0.pdf

Peter D. Hart Research Associates, Inc. (2002, February). *Changing public attitudes toward the criminal justice system.* Retrieved from Open Society Foundations website: https://www.opensocietyfoundations.org/sites/default/files/Hart-Poll.pdf

Petersilia, J., & Deschenes, E. P. (1994). Perceptions of punishment: Inmates and staff rank the severity of prison versus intermediate sanctions. *Prison Journal, 74,* 306–328. http://dx.doi.org/10.1177/0032855594074003003

Pew Center on the States. (2008). *One in 100: Behind bars in America.* Retrieved from http://www.pewtrusts.org/~/media/legacy/uploadedfiles/wwwpewtrustsorg/reports/sentencing_and_corrections/onein100pdf.pdf

Pew Center on the States. (2009). *One in 31: The long reach of American corrections.* Retrieved from http://www.pewtrusts.org/~/media/legacy/uploadedfiles/wwwpewtrustsorg/reports/sentencing_and_corrections/onein100pdf.pdf

Pew Charitable Trusts. (n.d.) One in 31 U.S. adults are behind bars, on parole or probation. Retrieved from http://www.pewtrusts.org/en/about/news-room/press-releases/0001/01/01/one-in-31-us-adults-are-behind-bars-on-parole-or-probation

Smith, P., Goggin, C., & Gendreau, P. (2002). *The effects of prison sentences and intermediate sanctions on recidivism: General effects and individual differences.* Retrieved from Public Safety Canada website: http://www.publicsafety.gc.ca/cnt/rsrcs/pblctns/ffcts-prsn-sntncs/index-en.aspx

Spelman, W. (1995). The severity of intermediate sanctions. *Journal of Research in Crime & Delinquency, 32,* 107–135. http://dx.doi.org/10.1177/0022427895032002001

United States Courts. (2013, July 18). Supervision costs significantly less than incarceration in federal system. Retrieved from http://www.uscourts.gov/news/2013/07/18/supervision-costs-significantly-less-incarceration-federal-system

Washington State Institute for Public Policy. (2016, June). Benefit-cost results. Retrieved from http://www.wsipp.wa.gov/BenefitCost?topicId=2

Wodahl, E. J., Ogle, R., Kadleck, C., & Gerow, K. (2009). Offender perceptions of graduated sanctions. *Crime & Delinquency, 59,* 1185–1210. http://dx.doi.org/10.1177/0011128709333725

Wood, P. B., & Grasmick, H. G. (1999). Toward the development of punishment equivalencies: Male and female inmates rate the severity of alternative sanctions compared to prison. *Justice Quarterly, 16,* 19–50. http://dx.doi.org/10.1080/07418829900094041

Wood, P. B., & May, D. C. (2003). Racial differences in perceptions of the severity of sanctions: A comparison of prison with alternatives. *Justice Quarterly, 20,* 605–631. http://dx.doi.org/10.1080/07418820300095631